UNITED STATES of America, Plaintiff-Appellee,

v.

Nathan W. BARNES, and Kenneth L. McGinn, Defendants-Appellants

No. 84–1109.

United States Court of Appeals, Fifth Circuit.

May 16, 1985.

Rehearing Denied July 5, 1985.

Leighton Cornett, Paris, Tex., for defendants-appellants.

Edward C. Prado, U.S. Atty., John Emerson, Sidney Powell, Asst. U.S. Attys., San Antonio, Tex., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GOLDBERG, RUBIN and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge.

Appellants Nathan W. Barnes and Kenneth L. McGinn were charged with conspiracy to convert monies of the United States to their own use contrary to 18 U.S.C. § 371[1] and conversion of said monies to

---

1. 18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each

their own use contrary to 18 U.S.C. § 641.[2] Both were charged with conspiracy in count 1 of a superseding indictment; Barnes was charged with conversion of government funds in counts 2, 4, 5, 6 and 7 while McGinn was charged with the same violation in counts 2, 3, 4 and 8 of the superseding indictment. The charges arose as a result of misrepresentations and irregularities that occurred with Farmers Home Administration (FmHA) loans which McGinn borrowed and which Barnes, as county supervisor of the FmHA, authorized and monitored.[3]

The jury found Barnes and McGinn guilty on all counts as charged.[4] Barnes and McGinn appeal their convictions challenging (1) the alleged failure of the government to prove criminal intent and (2) the alleged failure of the government to prove two essential elements of section 641: (a) that the government suffered actual property loss and (b) that no consideration was received for the borrowed federal funds. For the reasons stated below, we affirm all the convictions.

## I. *Facts*

In count 2, Barnes and McGinn were charged with converting $10,000 in government funds.[5] McGinn and Barnes helped McGinn's nephew Glenn McGinn (Glenn) apply for and secure an FmHA loan despite the fact that Glenn did not possess the ten years' farming or ranching experience that was a prerequisite for the loan. McGinn directed Glenn to indicate on the application that he possessed ten years of ranching experience. Barnes then indicated on Glenn's farm and home plan that $17,630 was required to purchase forty cows, two bulls, a used pickup truck and a tractor and shredder.

Subsequently a United States Treasury check in the amount of $17,630 was drawn in favor of Glenn and deposited in a checking account at the Fairfield State Bank.

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 641, as the judge instructed the jury, provides:

Whoever ... steals, purloins, or knowingly converts to his [own] use or the use of another ... any ... money, or thing of value of the United States or of any department or agency thereof (having a value in excess of the sum of $100)—(shall be guilty of an offense against the United States).

3. The procedure for obtaining an FmHA loan begins with the filing of an application with the county supervisor, a full-time federal employee. The application sets forth the purpose for which the loan is sought. With the assistance of the county supervisor, the applicant also prepares a form entitled "farm and home plan," which lists the applicant's assets and liabilities and the equipment or livestock to be purchased. The county supervisor then conducts an investigation and furnishes the completed application forms to a county committee, which consists of three persons appointed from the community who serve without pay for staggered one-year terms. The county committee does no investigating of its own and merely determines from the documents whether the applicant is eligible to receive an FmHA loan.

If the application is approved, a United States Treasury check is issued in the amount of the loan and deposited in a local bank in the applicant's name with the express condition that no money can be withdrawn without the countersignature of the county supervisor. The applicant also executes a promissory note and a security agreement. Whenever an approved purchase is made with some or all of the FmHA loan proceeds, the purchase—whether equipment or livestock—is listed on the security agreement and serves as collateral for the loan.

The county supervisor must service the loan, check on the security, and monitor the repayment. If, after the loan is obtained, the applicant desires to use the funds for a purpose not originally intended, the county supervisor must revise the farm and home plan to reflect this change. Guidelines issued by the FmHA prohibit employees, including county supervisors, from having business dealings with FmHA borrowers.

4. The district court then sentenced each defendant to five years imprisonment on the conspiracy count and to ten years imprisonment on each of the substantive counts. All sentences were to run concurrently except for one of the substantive counts as to each defendant which was to run consecutive to the other counts. Sentences on the consecutive counts, count 7 for Barnes and count 8 for McGinn, were then suspended in favor of a five year probationary period.

5. As count 2 is relied upon by both the government and the defendants as most indicative of their respective positions, we reach it first and state the facts of count 2 in detail.

Barnes cautioned Glenn that checks written on this FmHA-supervised account would be invalid unless they were countersigned by Barnes. Glenn later appeared in Barnes' office and signed a blank Fairfield State Bank check allegedly for the purpose of purchasing the livestock and equipment listed on the farm and home plan. Barnes told Glenn that his assistant would fill in the necessary information on the check later. This check was negotiated on June 14, 1978, at which time it was countersigned by Barnes, was payable to McGinn in the amount of $13,430 and was endorsed by McGinn. Neither Barnes nor McGinn ever told Glenn that McGinn was the payee nor did they indicate to Glenn who owned the livestock or equipment he had allegedly purchased. That same day McGinn took the check to the First National Bank of Teague, and made a net deposit into his personal account of $10,330—this sum represents the balance of the $13,430 check less $3,100 McGinn received in cash.

A short time later Charles Armstrong, a cattle rancher, applied for an FmHA loan to purchase cattle and rent pasture land. While in Barnes' office for the purpose of the loan closing, he was asked to help Barnes purchase a jeep from an individual named Bob Eckerson. According to Barnes the purchase price was $1,000 and Barnes could not lawfully make the purchase for unexplained reasons. Barnes displayed a check face down and asked Armstrong to sign it on the back in order to facilitate the purchase. Armstrong agreed and signed his name at the place ordinarily reserved for endorsements. Armstrong did not look at the front of the check and never saw the check again before it was negotiated.

Some time after Armstrong had affixed his signature on the check, the names of the maker, payee and final endorser were added. When completed, the check, in the amount of $10,000, bore the signature of McGinn as the maker, Armstrong as the payee and Barnes as the final endorser. The check was written on the same personal account at the First National Bank of Teague into which McGinn had earlier deposited $10,330.[6] On the same day, Barnes deposited the $10,000 check in another account at the First National Bank of Teague and then wrote a check payable to himself on the same account in the same amount; he then used the proceeds to pay off certain personal notes.[7]

After having signed the $13,430 loan-check in Barnes' office, Glenn accompanied McGinn to a pasture that was supposed to contain the forty cows and two bulls that he had purchased. Glenn saw only thirty cows there; McGinn told Glenn that he need not worry about the shortage and that he would locate the ten missing cows. McGinn also volunteered to assist with the branding, a requirement of the FmHA contract. In fact McGinn did not locate or explain the absence of the missing cattle nor were any of the livestock supposedly purchased by Glenn ever branded. Of the thirty cows that could be accounted for, eight or nine strayed away and were never found, while others died and had to be replaced by subsequent purchases.

Later Glenn told Barnes that the pasture land was dry and that the cattle were starving. He requested release of the amount remaining in his FmHA-supervised account so that he could purchase feed. Barnes suggested that Glenn's best course would be to sell the cattle. Accordingly, Glenn transferred his remaining cows and two bulls to Barnes' pasture; thereafter, Barnes advised Glenn that the cattle had been sold. He summoned Glenn to the FmHA office where Glenn endorsed and

---

6. The personal account had an initial balance of $26.77. Thereafter, McGinn deposited $10,330 and deducted the $10,000 check. The final balance of the account was exactly $356.77.

7. The net result of these banking machinations, according to Barnes, is that the proceeds of Glenn's FmHA loan were utilized to purchase

livestock owned by Barnes. Consequently, Barnes argues, his subsequent receipt and use of the funds did not constitute conversion since Glenn in fact received livestock as consideration for the expenditure of the FmHA-supervised loan funds.

left a check representing the proceeds of the sale of the remaining livestock. Barnes did not apply any of the sale proceeds to offset the amount owed by Glenn on the original $17,630 FmHA loan. Neither the supervised bank account nor the FmHA record of Glenn's deposits and withdrawals reflected any credit for the sale of the remaining livestock. Moreover, since the number of cows purported to have been sold on behalf of Glenn was merely half the number originally purchased, Glenn realized that he still owed a debt to the FmHA. When he asked Barnes and McGinn about the loan balance, both of them told him not to concern himself about it because the balance would be written off.

Counts 3 and 8 involved only McGinn. They concern McGinn's use of funds from his own FmHA-supervised account for purposes outside those authorized by the loan which created the account. In count 3, McGinn was charged with converting $4,800 which represents a check drawn from his FmHA account, countersigned by Barnes, and payable to McGinn's nephew, Jackie Daniels, ostensibly for the purchase of fifteen cows. McGinn directed Daniels to endorse the check and then directed another nephew, Edgar McGinn, to further endorse the check in order to purchase a used front-end loader and a logging truck. The purpose of these transactions was to enable Edgar to enter the logging business even though McGinn's FmHA-supervised account was for the stated purpose of improving certain lands and for obtaining cattle, a tractor, a pickup truck and a trailer. After two months, the logging operation was shut down and McGinn subsequently sold the two vehicles to his son Larry. In count 8, McGinn persuaded a third party to cash a $1,200 check drawn on his FmHA-supervised account ostensibly for the purchase of a bull. That person then returned the money to McGinn.

The transactions underlying counts 4 through 7 appear to have arisen from Barnes' desire to sell cattle to FmHA borrowers, an activity that he admits violated FmHA guidelines. *See* note 3, *supra.* In count 4 the buyer already had an FmHA loan. In counts 5, 6 and 7 the buyers did not yet have an FmHA loan. In each case where the buyer did not yet have an FmHA loan he was unqualified for one; Barnes or McGinn would help each buyer fill out an application for a loan that contained false statements about the borrower's qualifications.

Once the buyer had a loan, Barnes, sometimes with McGinn's help, would set up a bogus cattle-sale to hide his role in the exchange. In counts 4 and 5 Barnes used a falsified bill of sale to reflect purchases by the borrowers from a local rancher.[8] He would have checks made payable to the borrowers and record them as reimbursement to the borrowers for the fake purchases that had ostensibly already taken place. The borrowers would then turn the money over to Barnes as "consideration" for their purchase of Barnes' cattle. In counts 6 and 7 he would have a check from an FmHA-supervised account made out to a third person who actually had no role in the sale, and record it as the borrower's purchase of livestock or equipment from that third person. He would then induce the third person to endorse the check over to him (Barnes). In all cases it appears that the FmHA-supervised loan funds were used for purposes other than that for which they were intended.

## II. *Criminal Intent*

Barnes and McGinn argue that the prosecution wholly failed to prove they possessed the criminal intent necessary to sustain their convictions. Their argument essentially challenges the sufficiency of the evidence brought forth by the government to prove criminal intent. Accordingly, we view the evidence and given inferences that may be drawn therefrom in the light most favorable to the government. *See Glasser*

---

**8.** The local rancher, C.L. Carroll, was a frequent seller of cattle to FmHA borrowers; as a matter of convenience, he left signed, blank bills of sale at the trading pens so that transactions could be completed by the auctioneers even in his absence. Presumably, this would account for the origin of the falsified bills of sale.

*v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In addition, on review we must judge the evidence as sufficient to support a conviction if "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

▪ Appellants contend that the jury improperly concluded that they possessed the requisite criminal intent. They contend first that *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), precludes a finding of criminal intent simply because the FmHA-supervised funds finally came into their possession. They assert that the evidence established only that the transactions were cloaked in secrecy and misrepresentation because they wanted to protect Barnes from being subject to administrative discipline for dealing with FmHA borrowers and not because they intended to convert government funds.[9] Second, they contend that the jury should have inferred a lack of criminal intent by virtue of evidence that tended to establish their good characters. *Morissette*, 342 U.S. at 276, 72 S.Ct. at 256 ("[The jury] might have concluded that ... the lack of any conscious deprivation of property or intentional injury was indicated by Morissette's good character....").

▪ We find appellants' position meritless and their reliance on *Morissette* misplaced. With respect to their second contention, *Morissette* turned on the district court's failure to submit to the jury whether or not the taking of "abandoned" government property was innocent. Here the district court properly instructed the jury;[10] more importantly, there is no indication that the jury did not take evidence of Barnes' and McGinn's good character into account when it impliedly found they possessed the requisite criminal intent and that the conversions were not innocent.

▪ With respect to their first contention, the Supreme Court noted in *Morissette* that "knowing conversion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion." 342 U.S. at 270–71, 72 S.Ct. at 254. This language effectively responds to Barnes' and McGinn's first contention. While Barnes may have hoped to evade disciplinary action for dealing with FmHA borrowers,[11] he does not deny that he knew, as a fact, that in every count involving new FmHA borrowers the applicant misrepresented that he (the applicant) possessed the requisite farming or ranching experience to obtain such a loan and that in all counts the loans were not utilized directly for the purposes for which they were intended. Barnes' and McGinn's lack of knowledge as to the applicable law does not preclude a finding of criminal intent nor does their alleged effort to evade disciplinary action against Barnes preclude such a finding. *Morissette*, 342 U.S. at 271, 72 S.Ct. at 254. The evidence, with inferences favorable to the government, is sufficient to enable a reasonable trier of fact to find that criminal intent has been proven beyond a reasonable doubt.

---

9. *See* note 3, *supra*. We find absolutely no merit in appellants' collateral argument that they should be afforded some leniency because the United States Attorney's Office prosecuted them for actions which the Department of Agriculture had instructed would simply constitute a disciplinary violation. *See Morissette*, 342 U.S. at 271, 72 S.Ct. at 254.

10. As the district court instructed the jury:
[E]vidence of a Defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crime charged, may give rise to a reasonable doubt, since the jury may think it improbable that a person of good character in respect to those traits would commit such a crime.

11. It is doubtful whether McGinn, who is not a county supervisor, is entitled to argue, as Barnes does, that the reason for establishing these transactions was not the avoidance of criminal conversion charges but rather the avoidance of administrative discipline. Nevertheless, our rejection of this argument as to Barnes renders McGinn's argument meritless as well.

### III. *Actual Property Loss*

Appellants contend that the government failed to prove two necessary elements of a violation of 18 U.S.C. § 641: first, that the government suffered actual property loss as a result of appellants' conduct and, second, that the FmHA borrowers did not receive adequate consideration for the supervised funds that were spent. They then assert, with respect to count 2, that the check for $13,430 payable to McGinn and countersigned by Barnes showed on its face that Glenn, the borrower, received adequate consideration for the money borrowed from the FmHA in the form of forty cows and two bulls.[12]

■ Appellants' second contention is meritless. The consideration that the FmHA borrower may or may not have received is irrelevant to a charge of conversion under section 641. Appellants were not charged with conversion of the borrower's property; rather, they were charged with conversion of government funds by virtue of their unlawful procurement and unlawful use of those funds. As the Supreme Court stated in *Morissette:* "Conversion, however, may be consummated without any intent to keep and without any wrongful taking.... It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." *Morissette,* 342 U.S. at 271–72, 72 S.Ct. at 254. Merely because the FmHA borrowers may have received some livestock and/or equipment in return for expended FmHA-supervised funds does not alter or lessen the plainly obvious fact in this case that the funds were obtained as a result of misrepresentations, that many of the borrowers were not qualified for these loans and that the funds were utilized for purposes other than those for which they were intended.[13]

■ Appellants' first contention, however, warrants more careful attention. They argue that section 641 requires proof of actual loss by the government and then assert that the evidence is not sufficient to establish that the government suffered an actual property loss. Appellants admit, however, that "[t]he entire thrust of the prosecution was to show that money from [FmHA] supervised accounts in various banks went to either defendant Barnes or defendant McGinn." We need not decide whether the evidence is sufficient to establish a property loss by the government as we are convinced that proof of the government's property loss is unnecessary to prove a violation of section 641.

Appellants rely upon *United States v. Collins,* 464 F.2d 1163, 1165 (9th Cir.1972), for the proposition that section 641 requires proof that the government suffered an actual property loss. Further, and more significantly, they refer us to *United States v. Evans,* 572 F.2d 455, 471 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (Hill, James, J.), a case in which we cited *Collins* for the proposition set forth above. The government asserts that the language appearing in *Evans* was "nothing more than obiter dictum" which we are not bound to follow. The government also asserts that the holding in *Collins* and the authority it relied upon have been disapproved of by the Seventh Circuit in *United States v. Bailey,* 734 F.2d 296 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984). Recognizing that a split in the circuits exists and determining that we are not bound by the dictum of *Evans,* we find that *Bailey* and not *Collins* provides the appropriate analysis which we now follow.

In *Evans* this Court addressed the argument of two defendants that Federally In-

---

**12.** In their brief on appeal, appellants are not quite frank with the Court as they failed to include the fact that Glenn purchased approximately thirty cows and not forty cows as intended under the loan.

**13.** We do note that the receipt of consideration by the borrower may provide a defendant with the argument that such consideration could pos-

sibly provide some security for the FmHA loans at issue and thus protect the government against an actual loss on the loans. This argument, however, is foreclosed by our conclusion that the government need not prove that it suffered an actual property loss in a prosecution brought pursuant to section 641.

sured Student Loan and National Direct Student Loan funds should not be characterized, as a matter of law, as government property for the purpose of section 641. In doing so, we stated as dictum that, "it is an essential element of a violation of 18 U.S.C.A. § 641 that the government suffer some actual property loss." 572 F.2d at 471 (citing *Collins,* 464 F.2d at 1165) (*Collins* turned on the "principle that a bank which is induced to pay a check upon a forged endorsement loses its own money and not that of its depositor [*i.e.,* the government]." *Evans,* 572 F.2d at 474 n. 20). In *Evans* we relied upon the language in *Collins* for two purposes quite apart from that which is anticipated by the direct meaning of the language quoted above. First, we sought to clarify that the trier of fact has the responsibility of determining the federal nature of funds allegedly converted under section 641. Second, we sought to bolster the argument that the funds must be federal in nature by asserting the *"government* suffer some actual property loss." *Evans,* 572 F.2d at 471 (emphasis added). Accordingly, we decline to follow the dictum in *Evans* insofar as it stands for the proposition urged by appellants.[14]

In *Collins,* the defendant was charged under section 641 with forging and negotiating checks on a bank account partially funded with federal money. The district court's determination that, as a matter of law, the funds were federal was reversed by the Ninth Circuit. The court, in a two-to-one decision, reasoned that the funds were those of the bank and not of the government because the bank paid a draft bearing a forged endorsement.[15] The court went on to state that, "[i]t is an essential element of the crime of stealing Government property in violation of 18 U.S.C. section 641 that the Government have suffered an actual property loss." 464 F.2d at

1165. The court did not explain the rationale for imposing such a requirement nor did it indicate that such a requirement was contemplated by Congress either by the plain language of section 641 or by its legislative history. The court did cite *United States v. Johnston,* 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925), and *United States v. Alessio,* 439 F.2d 803 (1st Cir.1971), for the proposition stated above. Neither *Johnston* nor *Alessio,* however, directly or indirectly stand for the proposition that the government must prove it suffered an actual property loss in order to prosecute a section 641 violation. Rather, both decisions support the admitted and essential requirement of section 641 that the funds which have been embezzled, stolen, purloined or knowingly converted must be federal funds.

The Seventh Circuit in *Bailey* properly analyzed the cases that *Collins* cites as authority for the proposition that the government must prove it suffered an actual property loss:

In *United States v. Johnston,* the defendant failed to pay the federal tax on admission fees to a boxing contest. Thereafter, he was convicted of failing to pay the tax and embezzling that portion of the fees representing the tax. The District Court vacated the embezzlement conviction, was reversed by the Court of Appeals, but was then upheld by the United States Supreme Court. The Court reasoned that:

It seems to us that under this [tax] law the person required to pay over the tax is a debtor and not a bailee. The money paid for the tax is not identified at the outset but is paid with the price of the ticket that belongs to the owner of the show. We see no ground for requiring the ticket office

14. In *United States v. Becton,* 632 F.2d 1294 (5th Cir.1980), *cert. denied,* 454 U.S. 837, 102 S.Ct. 141, 70 L.Ed.2d 117 (1981), we stated that, "[w]e are not bound by dicta, even of our own court." *Id.* at 1296 n. 3 (citing *Bruce v. Estelle,* 536 F.2d 1051, 1059 n. 5 (5th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977)).

15. The majority's "commercial note" analysis has been criticized in *United States v. Pavloski,* 574 F.2d 933, 935–36 (7th Cir.1978), and distinguished in *United States v. Benefield,* 721 F.2d 128, 130–31 (4th Cir.1983).

of a theatre to create a separate fund by laying aside the amount of the tax on each ticket and to keep it apart, either in a strong box or as a separate deposit in a bank. 268 U.S. at 226–227, 45 S.Ct. at 496–97.

The court's holding was that the portion of the funds representing the tax had not become the government's property in the hands of the defendant and, therefore, its retention by the defendant could not constitute embezzlement. This was simply an application of the principle previously recognized in *United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910) that where a debtor-creditor relationship exists the unlawful retention of funds by the debtor is not embezzlement. Nowhere in the opinion in *Johnston* was the issue of the existence of a government property loss ever mentioned. Therefore, we do not find that *Johnston* is authority for the proposition stated in *Collins*.

In *Alessio*, the defendant was charged under § 641 with larceny of government property. One of the items of property allegedly stolen from the government agency was United States currency which was maintained in a petty cash fund. At trial, defense counsel attempted to show that the cash was actually owned by an employee who owed it to the government. The trial court precluded this defense, however, by ruling that the money belonged to the government. The Court of Appeals reversed, stating:

> The court could properly make a ruling of law with respect to title, predicated upon findings of fact which it left to the jury. However, it is clear that the court did more. It left nothing to the jury. It made a "finding" that the money belonged to the government, which was not only an essential element in the government's case, but depended upon an acceptance of the testimony of the government witnesses. The court cannot make a finding accepting the government's testimony, no matter how clear it may be; the burden still remained on the government to prove the money in the fund belonged to it. 439 F.2d at 804.

Thus, the court in *Alessio* focused strictly on the requirement of § 641 that the property misappropriated must be found by the jury to be government property. There is no discussion in the opinion of the need to show an actual property loss and no such requirement can be properly inferred from its holding. Therefore, we conclude that the *Alessio* case also does not support the principle stated in *Collins*.

*Bailey*, 734 F.2d at 302.

We agree with the reasoning and conclusion of the Seventh Circuit that neither *Johnston* nor *Alessio* provides support for the principle enunciated in *Collins*. In addition, our review of cases which have adopted the *Collins* principle fails to uncover one which provides further explanation or analysis for the conclusion that property loss by the government is an essential element of a section 641 violation. Consequently, like the court in *Bailey*, we conclude that an independent analysis of section 641 is necessary to determine whether property loss by the government is an essential element of the crime. 734 F.2d at 303.

In *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Supreme Court traced the judicial and legislative history of section 641 and concluded that:

> [t]he history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions.

*Id.* at 269 n. 28, 72 S.Ct. at 253 n. 28. Thus, to the extent that proof of the victim's property loss is irrelevant to the charge of embezzlement at common law, it

is also irrelevant to a charged violation of section 641.[16]

 It has consistently been held that to prove embezzlement one need not prove that the victim suffered an actual property loss, *United States v. Weaver,* 360 F.2d 903, 905 (7th Cir.), *cert. denied,* 385 U.S. 825, 87 S.Ct. 57, 17 L.Ed.2d 61 (1966); *Golden v. United States,* 318 F.2d 357, 361 (1st Cir.1963), nor is proof that the victim suffered no loss a defense to a charge of embezzlement. *Dobbins v. United States,* 157 F.2d 257, 259 (D.C.Cir.), *cert. denied,* 329 U.S. 734, 67 S.Ct. 99, 91 L.Ed. 634 (1946); *see also* 29A C.J.S. *Embezzlement,* § 25b (1965). Accordingly, to the extent that embezzlement at common law does not require, as one of its essential elements, proof of an actual property loss by the victim, we do not believe that a prosecution for conversion of government funds pursuant to section 641 requires that the government prove it suffered an actual property loss.[17]

Our holding is further supported by the fact that imposition of an actual property loss requirement could defeat or unduly restrict the main purpose of section 641. Section 641 is intended "to provide a sanction for intentional conduct by which a person either misappropriates or obtains a wrongful advantage from government property." *United States v. Bailey,* 734 F.2d at 304 (citing *Morissette v. United States,* 342 U.S. at 271, 72 S.Ct. at 254). Thus, in certain instances, imposition of an actual property loss requirement may prevent the prosecution of individuals who have intentionally misappropriated government funds.

Moreover, in *Elmore v. United States,* 267 F.2d 595 (4th Cir.), *cert. denied,* 361 U.S. 832, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959), a case much like this one, the Fourth Circuit rejected an argument similar to that urged by Barnes and McGinn. In *Elmore* the defendant, a manager of a grain storage warehouse partially utilized by the Commodity Credit Corporation (CCC), was convicted pursuant to 15 U.S.C. § 714m(b) of embezzling wheat owned by the CCC. On appeal, the defendant argued that the government suffered no loss because he was able to produce sufficient wheat upon demand of the CCC. In effect, the defendant argued that the government suffered no *actual* property loss. The court rejected that argument and stated that:

> [t]he criminal sanction of the statute is imposed to prohibit the unlawful use of another's property, and the statute does not permit the converter to subject the owner to the risk of loss and relieve the converter of criminal liability if his operations are successful and he makes restitution.

267 F.2d at 601. Similarly, the criminal sanction of section 641 attempts to prevent, as in this case, misrepresentation of a borrower's qualification for government loan funds and the utilization of those loan

---

**16.** In *United States v. Bailey,* 734 F.2d at 303–04, the court undertakes a similar analysis. In that case, the defendant had been charged with *embezzlement* of public funds; in our case, however, defendants have been charged with *conversion* of public funds. Nevertheless, we do not find this distinction significant for two reasons. First, § 641 is to apply to acts "which shade into [the crimes of larceny and embezzlement] but which, most strictly considered, might not be found to fit their fixed definitions." *Morissette,* 342 U.S. at 269 n. 28, 72 S.Ct. at 253 n. 28. Conversion and embezzlement are quite similar; moreover, the parallel nature of the two actions is readily visible here since Barnes supervised the FmHA loans at issue and since his countersignature was required for disbursements from the FmHA supervised accounts. Second, the Supreme Court noted the common-

ality between conversion and embezzlement when it stated that "[w]e find no other purpose in the 1948 re-enactment (§ 641) than to collect from scattered sources crimes so kindred as to belong in one category." *Morissette,* 342 U.S. at 266–67, 72 S.Ct. at 251–52. Accordingly, the reasoning and analysis of the *Bailey* decision is equally applicable in this action charging conversion rather than embezzlement of monies of the United States.

**17.** Consequently, we decline to address whether temporary possession and control over improperly obtained government funds would satisfy an "actual property loss" requirement. *See United States v. Mitchell,* 625 F.2d 158, 162 (7th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980).

funds for purposes which the statute did not intend.

The legislative history of section 641 as well as the purpose of the statute both lead us to hold that the government need not prove it suffered an actual property loss in order to establish a violation of section 641.

The judgment of the district court is AFFIRMED.