**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan MEDRANO, Jr.,**
**Defendant–Appellant.**

**No. 87–1342.**

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1988.

Rehearing and Rehearing En Banc
Denied March 8, 1988.

Charles L. Roberts, the Centre, El Paso, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., Helen M. Eversberg, U.S. Atty., El Paso, Tex., for plaintiff-appellee.

Before WILLIAMS and HIGGINBOTHAM, Circuit Judges, and BUCHMEYER *, District Judge.

* District Judge of the Northern District of Texas, sitting by designation.

JERRE S. WILLIAMS, Circuit Judge:

This appeal is from convictions based upon the sale of alien Border Crossing Cards to applicants who otherwise would have been unable to obtain them. Defendant Juan Medrano, an immigration inspector for the United States Immigration Service in El Paso, was convicted on one count of conspiracy and thirteen counts of selling government property in violation of 18 U.S.C. § 641. He appeals his convictions arguing that the evidence was factually and legally insufficient to support the convictions, that the prosecutor's closing argument violated his rights to due process and a fair trial, and that the court improperly declared a mistrial, placing him in double jeopardy. We affirm all the convictions, except for Count 15 where we reverse because there is insufficient evidence of selling government property valued at more than $100.

## I. Facts

Appellant Medrano's duties as an immigration inspector included working at the traffic lanes on the international bridge in El Paso inspecting incoming people and vehicles, and also approving applications for Non-resident Alien Border Crossing Cards. A Border Crossing Card permits a non-resident alien to enter the United States and remain for up to three days. An applicant is not charged for the card, which remains valid and may be used repeatedly unless it is revoked by the United States or reported lost.

The application for the card is a three-part document, containing the original and two copies. If approved, the original of the application is used to generate a permanent Border Crossing Card, a laminated card about the size of a driver's license; the second sheet is kept as a record by the Immigration Service; and the third sheet is given to the applicant to use as a temporary card.

The application must be completed and presented personally by the applicant at a port of entry into the United States. When the applicant appears at the port of entry,

he or she delivers the application to the receptionist who checks its completeness and stamps it with the date and time. The applicant is then directed to the seating area to wait until his or her name is called. Applications are handled on a first come, first served basis. Before the application is processed a check is made to learn if the Immigration Service has an unfavorable record on the individual. If one is found to exist, the record is ordered and the applicant is told to return later.

If there is no unfavorable record indicated, the application is stamped and proceeds to the next stage—the interview. An inspector obtains the name of the applicant from the application and calls him or her to the counter for an interview. The inspector reviews the data on the application, questions the applicant and checks the required supporting documentation: a Mexican passport or "Form 13" identity document; a letter, salary vouchers, or other documents demonstrating employment in Mexico; and, documents, such as receipts for utility payments or lease payments attesting to domicile in Mexico. If the inspector decides that the applicant is eligible to receive a Border Crossing Card, he or she signs and dates the application and stamps it with a personal admission stamp. The applicant then receives the third copy of the application to use until the receipt of a permanent card.

Medrano was convicted of devising a system with two taxi cab drivers in Juarez, Mexico, under which the driver would give him a list of names of people needing Border Crossing Cards. He would give these people pre-dated stamped blank application forms. The individuals would then appear at the immigration office with the pre-stamped forms filled in. Instead of proceeding through the normal channels of several employees, the applicants would be called directly to Medrano. He would run the necessary computer check, approve the application and issue a temporary Border Crossing Card.

Upon approval by an Immigration Service supervisor, the permanent laminated Border Crossing Card virtually always issues 90 days after the issuance of the temporary Border Crossing Card. The supervisors merely duplicate the computer check. Thus, the issuance of the temporary card by Medrano virtually assured issuance of a permanent card. For each application Medrano approved he received $50 in a brown paper bag from the cab drivers. Although Medrano's cut was only $50, each customer paid over $100 for the entire transaction, except in one case (Count 15) in which the customer paid less.

Medrano was indicted on one count of conspiracy to accept a bribe, thirteen counts of accepting bribes and thirteen counts of selling government property. His first trial ended in mistrial because the jury was deadlocked. On retrial, Medrano was convicted on one conspiracy count and the thirteen counts of selling government property; he was acquitted on the counts of accepting bribes. Medrano was sentenced to two years imprisonment on each count, each sentence running concurrently for a total of two years prison time.

## II. *Sufficiency of Evidence*

Medrano contends that the evidence is factually and legally insufficient to support his conviction for conspiracy and for selling government property in violation of § 641.[1] We first address the conspiracy claim.

### A. *Conspiracy*

■ The elements of a conspiracy charge consist of (1) an agreement between two or more persons to commit an offense and (2) the commission of an overt act by one of them in furtherance of the agreement. *United States v. Wilson,* 657 F.2d 755, 758 (5th Cir.1981). The Government must

---

1. 18 U.S.C. § 641 (1982) reads in pertinent part:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority sells, conveys or disposes of any record voucher, money, or thing of value of the United States ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100.00, he shall not be fined more than $1,000 or imprisoned not more than one year, or both.

prove that a conspiracy existed, that Medrano knew of its existence, and that, with knowledge, he voluntarily became a part of it. *United States v. Graves*, 669 F.2d 964, 969 (5th Cir.1982). Medrano claims that the Government failed to prove the existence of an "agreement." Medrano contends that the only evidence of "agreement" presented by the Government consists of the testimony of Jose Palimino, one of the cab drivers, who stated at trial that he merely asked Medrano to help his relatives obtain Border Crossing Cards, and paid Medrano for the favor.

When a conviction is appealed for insufficient evidence, this Court must view the evidence in the light most favorable to the Government, with all inferences drawn in support of the jury's verdict. *Glasser v. U.S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We must affirm the conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The Government presented evidence upon which a rational trier of fact could have found, beyond a reasonable doubt, that a conspiracy existed between Medrano and the cab drivers. One of the applicants testified that she attempted to pay Medrano, but that he indicated that she should pay the taxi cab driver. Medrano accepted the lists and the payment from the cab drivers, and violated departmental rules in processing the applicants. This evidence shows a concert of action among Medrano and the cab drivers. Because proof of a conspiracy may be inferred from a concert of action, *United States v. Aguirre Aguirre*, 716 F.2d 293, 297 (5th Cir.1983), the evidence suffices to support Medrano's conviction for conspiracy.

### B. *Sale of Government Property*

■ Under § 641, the Government must prove the elements of the offense of sale of government property: (1) the property belonged to the United States, (2) Medrano sold, conveyed, or disposed of such property, (3) he did so willingly and knowingly

without authority, and (4) the property had a value in excess of $100. Medrano claims that two of these elements are lacking. First he claims that there is insufficient evidence to establish that he "sold conveyed or disposed" of Border Crossing Cards. Medrano also argues that the evidence was insufficient to establish the value of the Border Crossing Cards as exceeding $100. We first address his claim regarding the "sale" and then his claim on valuation of the cards.

Medrano argues that the "card" at issue is the permanent Border Crossing Card, which he had no authority to issue and that his approval of an application for a temporary card could not be construed as "selling, conveying, or disposing." The evidence establishes that a temporary card provides the bearer with the same rights as a permanent card, and that Medrano's approval of the application for the temporary card virtually assured the applicant of obtaining a permanent card.

■ Although Border Crossing Cards are issued free of charge, Medrano was, for a fee, approving the applications of people who, for various reasons, were not qualified. By furnishing the applicant with the temporary Border Crossing Card, Medrano was essentially selling a package deal, and facilitating the acquisition of a permanent Border Crossing Card. Because of this Court's holding that the government need not prove actual property loss under § 641, *United States v. Barnes*, 761 F.2d 1026 (5th Cir.1985), Medrano's activity constitutes "selling, conveying, or disposing," under the statute. He was not merely providing a service; he was selling the actual card.

■ Medrano also argues that the evidence is insufficient to establish the value of the property sold as being in excess of $100. He reasons that although all the applicants but one paid over $100 for the entire package deal, Medrano himself only received $50. He claims that he sold, if anything, only temporary Border Crossing Cards, and that these were not worth $100. As we have already stated, Medrano was

selling a package deal, not merely a temporary Border Crossing Card. The temporary card virtually assured issuance of the permanent card within 90 days. Thus, the value of the government property sold by Medrano is determined with respect to the entire transaction, culminating in the applicant's possession of a permanent Border Crossing Card.

As a general rule, value under § 641 is determined by "market forces—the price at which the minds of a willing buyer and seller would meet." *United States v. DiGilio*, 538 F.2d 972, 979 (3d Cir.1976). Thus, the evidence of the price paid by the applicants, which exceeded $100 in every case but one, suffices to support a valuation consistent with § 641. Count 15, however, involves an applicant paying less than $100, and must be reversed.

### III. *Double Jeopardy*

■ Medrano contends that in his first trial the district court improperly declared a mistrial after only twelve hours of deliberation so that his second trial was barred by the constitutional prohibition against double jeopardy.

This Court must accord great deference to a decision to declare a mistrial. *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). We have previously held that retrial is not barred where a court "carefully considered the alternatives and did not act in an abrupt, erratic, or precipitate manner." *Grandberry v. Bonner*, 653 F.2d 1010, 1014 (5th Cir.1981). The trial judge declared a mistrial in Medrano's first trial after the jury sent three notes stating that they were deadlocked. The district court received the first note that the jury was deadlocked and sent the jurors home for the night. The jury sent the second note at 3:40 p.m. the next day. The judge then polled the jury and found that seven out of twelve thought a verdict could still be reached. After a return to deliberations, the jury sent the final note stating that the deadlock could not be broken. Un-

der these circumstances declaring a mistrial was not improper, and the second trial was not constitutionally barred.

### IV. *Prosecutorial Misconduct*

Medrano argues that his right to due process and a fair trial was violated by prosecutorial remarks referring to matters outside of the record. The statement in question occurred during the prosecutor's closing argument:

Secondly, ladies and gentlemen, when the agents interview the witnesses in these cases they make detailed reports of the interviews that they conduct during the time at the initial contact with the witnesses. And all of those have been turned over to Defense counsel in this particular case.

MR. ISLAS: Your honor, I would object. That's not in evidence. That's outside of the evidence.

THE COURT: Let's go on to something else.

Medrano argues that the failure of the district judge to make a formal ruling sustaining the objection left the matter to the jury and suggested additional evidence which was indicative of guilt.

■ The test for determining whether there was prosecutorial misconduct is "whether a prosecutor's remarks were improper and if so whether they prejudicially affected the substantial rights of the defendant." *United States v. Shakelford*, 709 F.2d 911, 913 (5th Cir.1983). A remark is not improper if made in direct response to a statement by defense counsel. *United States v. Brooks*, 786 F.2d 638 (5th Cir. 1986). We find that the prosecutor's remarks were made in direct response to defense counsel's closing remarks, which assailed the credibility of the prosecution's witnesses.[2] The prosecutor's remarks implied that defense counsel could have used the reports to impeach witnesses if their statements were inconsistent. We find

---

2. In closing, defense counsel made several statements regarding the alien applicants who testified: "they're going to use deception, deceit and lies in order to obtain entry into the United States," and "she's an old pro at lying ...," and "she was most of the time lying or trying to satisfy what the Government wanted her to say."

that the prosecutor's remarks did not affect a "substantial right" of Medrano, and there was no error.

We affirm the conviction of Medrano for one count of conspiracy and eleven counts of selling government records.[3] We reverse the conviction under Count 15 for insufficient evidence.

AFFIRMED, EXCEPT FOR ACQUITTAL ON ONE COUNT.

---

**3.** The Government dropped Count 24.