**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 11, 2013

No. 12-40470

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

CAROLINA AVILA,

Defendant–Appellant

Appeal from the United States District Court
for the Southern District of Texas
U.S.D.C. No. 7:11-CR-592

Before OWEN and HAYNES, Circuit Judges, and LEMELLE, District Judge.[*]

PER CURIAM:[**]

Carolina Avila appeals her convictions for conspiring to and substantively importing and possessing with the intent to distribute more than 500 grams of methamphetamine. She contends that insufficient evidence supported her convictions, that the jury improperly received a "deliberate ignorance" instruction, that the prosecutor made prejudicial closing remarks, and that the cumulative effect of these errors rendered her trial unfair. We AFFIRM.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40470

## I. Facts and Procedural History

Avila attempted to enter the United States by vehicle at the Hidalgo Port of Entry near McAllen, Texas. She was accompanied by her year-and-a-half-old daughter and Santos Lozano. Avila and her daughter are United States citizens, and Lozano is a legal permanent resident. Avila drove, while Lozano occupied the passenger seat. An opened case of twelve, forty-ounce Corona beer bottles sat in the back of the vehicle. Avila was nineteen years old.

Avila's minivan proceeded to the inspection checkpoint. Customs and Border Protection Officer Ezequiel Mendoza asked her a series of routine questions and checked the passengers' identification documents. Avila stated that she had recently flown in from Illinois to visit family in Reynoso, Mexico, and was staying in Mission, Texas. Avila declared the case of Corona.

Instead of waving Avila through to another station where Lozano, who was over twenty-one, could pay excise taxes on the beer, Mendoza decided to inspect the bottles. As he lifted a bottle out of the case, he noticed "particles" floating in the liquid. Because it was dark, he used a flashlight to take a closer look. Although the bottle and its contents appeared to be just like any other bottle of Corona beer, Mendoza observed fragments of a solid substance dispersed throughout the liquid. He removed several other bottles from the case, all containing the same unknown substance. Mendoza called a "K9" officer to the scene. The dog alerted to the case of beer.

Mendoza ordered Avila to proceed to a secondary screening area, where Avila related the same story of her visit to Customs Officer Tricia Aguon. Aguon asked Avila about her relationship to Lozano, and she identified him as a family friend. Aguon then inspected the bottles of beer and found the same floating particles as Mendoza. A field test returned a positive identification for methamphetamine. Avila also possessed $457 in cash. Lozano had none.

2

The officers then turned Avila over to United States Immigration and Customs Enforcement ("ICE") Agents Jeffrey Kicklighter and J.J. Flores. Under ICE policy, Kicklighter and Flores interviewed Avila together. They took notes, but made neither a video nor audio recording of the interrogation.

Avila retold her story, this time adding that she had taken a cab from Harlingen to Hidalgo and then crossed the border to meet her father, a Mexican citizen who had traveled to Reynoso from Nuevo Laredo to see her. Avila also told the agents that, in addition to seeing her father and uncle, she intended to visit Laredo—a three-hour drive away—so that she could see her mother, who was scheduled for surgery the next morning. Avila again described Lozano as a family friend, and she stated that he and his Corona were en route to a fish-fry in Mission.

Kicklighter and Flores then interviewed Lozano. After finding unspecified discrepancies between his and Avila's version of events, the agents returned to ask Avila additional questions. This time she told a much different story.

Avila shared that her father had a history of drug trafficking and that he had asked her to take the beer bottles across the border. Although Avila disavowed any knowledge of the bottles' contents, she related that her father had described the bottles using Spanish slang that she associated with illegal substances. Her father also allegedly told her that he would ensure that she received proper compensation for her efforts and that the bottles were ultimately destined for Dallas. Instead of a longstanding family friend, Lozano turned out to be an individual that Avila had met just hours before, when she picked him up at La Plaza Mall in McAllen per her father's instructions. Avila denied ever touching or examining the beer bottles.

Avila subsequently was charged with (1) conspiring to import 500 grams or more of methamphetamine, (2) importing 500 grams or more of methamphetamine, (3) conspiring to possess with intent to distribute 500 grams

or more of methamphetamine, and (4) possessing with intent to distribute more than 500 grams of methamphetamine.  At trial, the Government introduced testimony from Mendoza, Aguon, and Kicklighter, as well as an expert who testified that the beer bottles contained approximately 7.5 kilograms of methamphetamine, worth at least a quarter-million dollars in South Texas and much more in Dallas.  Avila did not testify, and the defense rested without calling witnesses or introducing evidence.  The jury convicted Avila on all four counts, and the district court sentenced her to 121 months in prison and to five years of supervised release.

Avila raises four issues on appeal.  She contends that insufficient evidence supports each count of conviction.  She further argues that the district court abused its discretion by issuing a "deliberate ignorance" instruction, which she claims allowed the jury to conclude that the Government satisfied its *mens rea* burden without showing actual knowledge.  Avila also asserts that the prosecutor made comments during closing arguments that improperly bolstered Kicklighter's testimony.  Finally, in Avila's view, the cumulative effect of the deliberate ignorance instruction and the prosecutor's remarks caused her to receive an unfair trial.  We reject each of these arguments below.

## II. Sufficiency of the Evidence

Avila first objects to the sufficiency of the evidence underlying her convictions.  At trial, Avila contended that the evidence showed only that she unwittingly played into a plan hatched by her father and carried out by Lozano.  Avila argues on appeal that, at most, the evidence stands in equipoise, obviating the possibility that a rational jury could have determined that the Government proved the elements of each count beyond a reasonable doubt.

We disagree.  Avila essentially asks us to ignore virtually all trial testimony in the Government's favor.  The Government introduced direct and circumstantial evidence—primarily, but not exclusively, from Kicklighter and

an expert—that rationally supported each element of each charged offense. The Government specifically presented evidence suggesting that, among other things, Avila admitted that she agreed to transport an illegal substance across the border for monetary compensation at the behest of her drug-trafficker father, that she knew the contraband would be further distributed at least as far as Dallas, and that the timing of her and Lozano's border crossings coincided with the second version of events she related to Agent Kicklighter. This evidence satisfied the Government's burden. *See, e.g.*, *United States v. Ojebode*, 957 F.2d 1218, 1223-28 (5th Cir. 1992) (discussing the elements for conspiracy to import, importation, conspiracy to possess with intent to distribute, and possession with intent to distribute a controlled substance).

Avila cross-examined the Government's witnesses about this evidence and presented an alternative version of events during closing arguments. The jury carried out its role as factfinder and found Avila guilty on each count. Viewed in the light most favorable to the jury's verdict, the evidence as a whole supported Avila's convictions beyond a reasonable doubt. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Miller*, 146 F.3d 274, 281 (5th Cir. 1998).

## III. Jury Instruction

In its instructions to the jury, the district court defined the term "knowingly" as an "act [that] was done voluntarily or intentionally, not because of mistake or accident." Following the Fifth Circuit's pattern deliberate ignorance instruction, the court then instructed the jury that it could

> find that [Avila] had knowledge of a fact if [it found] that [she] deliberately closed her eyes to what would otherwise have been obvious to her. While knowledge on the part of [Avila] cannot be established merely be demonstrating that [she] was negligent, careless, or foolish, knowledge can be inferred if [Avila] deliberately blinded herself to the existence of a fact.

No. 12-40470

Avila contends that this instruction allowed the jury to convict her on an inference of deliberate ignorance despite the Government's having presented only a direct-knowledge theory of guilt.

The district court appropriately instructed the jury on deliberate ignorance. Contrary to Avila's arguments, the record shows that the Government presented direct and circumstantial evidence supporting both that Avila actually knew of the drug scheme and that, at the least, she intentionally limited her knowledge of certain details.[1] For example, although she heard her father describe the bottles with a slang term reserved for contraband, she consciously avoided examining the bottles or further inquiring into their contents.[2] As the district court correctly recognized, this simply is not a case where the evidence presents a binary choice between actual knowledge or mere negligence. *See, e.g.*, *United States v. Mendoza-Medina*, 346 F.3d 121, 133 (5th Cir. 2003). Accordingly, the district court committed no error in giving a deliberate ignorance instruction.[3]

## IV. Prosecutorial Misconduct

During closing argument, Avila's attorney attacked the Government's case in part by insinuating that Kicklighter and Flores intentionally failed to make

---

[1] *See United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990) ("The circumstances which will support the deliberate ignorance instruction are rare. The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct.").

[2] *See United States v. Restrepo-Granda*, 575 F.2d 524, 529 (5th Cir. 1978) (holding, in the context of a conviction for importing a controlled substance, that a deliberate ignorance instruction is proper if "(1) [the defendant] knew he was importing . . . a controlled substance, or (2) he believed he was importing a controlled substance and through willful blindness failed to confirm that belief").

[3] Any error is harmless, in any case, given that the record contains evidence from which the jury rationally could have found that Avila had actual knowledge. *See, e.g.*, *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993).

a written or video recording of Avila's confession and that the Government kept Flores from testifying because he would have materially contradicted Kicklighter's trial testimony.  Construing this as a *Brady*-like argument made directly to the jury, the prosecutor responded during her closing argument by assuring the jury that "if there was any information that Agent Flores possessed contradictory information about the interview, the Government would [have been] required to disclose that to Defense Counsel, and Defense Counsel, if they so chose to do so, could present that [at trial]."  She also emphasized that the Government had the burden of proof and that it "accept[ed] the burden gladly."

The prosecutor then segued into additional commentary and suggested that either the Government had no reason to turnover Flores's statements or that the Government did so, but that Avila failed to call him as a witness.  She remarked to the jury:

> I would suggest to you that [Flores did not testify] because there was nothing different, nothing additional, that Agent Flores could have added to the testimony that would somewhat contradict what Agent Kicklighter told you.  So when you heard from Agent Kicklighter[,] you got a summary of everything that came up during the interview, and I assure you that if there was anything that was contradicting what Agent Kicklighter had said, you would have heard that during the trial.

The prosecutor later circled back to rebut defense counsel's attack on ICE's two-agent interview policy and told the jury that "[i]f there was anything else that came up that was not truthful by Agent Kicklighter, it would have had to have been disclosed to Defense Counsel. So there is a safeguard regardless of whether or not . . . a recording [was] made."

Avila contends these comments impermissibly bolstered the Government's evidence and rendered her trial unfair.  Because she did not contemporaneously object, we review for plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (discussing four steps of plain-error review).

No. 12-40470

Defense counsel's baseless and inappropriate impugning of the prosecutor's and the agents' integrity understandably provoked a strident response.[4] Thus, some response was appropriate.[5] But the prosecutor strayed from acceptably explaining her duties and the Government's burden to impermissibly testifying about Flores's reports and interview records—which were never before the jury—and vouching for Kicklighter's truthfulness. Our precedents forbid such commentary. *See, e.g.*, *United States v. Morris*, 568 F.2d 396, 401-03 (5th Cir. 1978).

Even so, we conclude that the comments did not impair Avila's substantial right to a fair trial. *See Puckett*, 556 U.S. at 135. In context, the prosecutor's remarks were a small part of her overarching closing arguments, and she made them to dispel "'any stigma cast upon [herself] or [her] witnesses'" by defense counsel's closing statement. *See United States v. Thomas*, 12 F.3d 1350, 1367 (5th Cir. 1994) (quoting *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981)). Additionally, the district court moderately mitigated any potential prejudice by including a general curative instruction in the jury charge. *See, e.g.*, *United States v. Aguilar*, 645 F.3d 319, 326 (5th Cir. 2011).

Although the Government's case rested heavily on Kicklighter's testimony, moreover, sufficient circumstantial evidence independently supported Avila's

---

[4] *See, e.g.*, *United States v. Montemayor*, 684 F.2d 1118, 1124-26 (5th Cir. 1982) (declining to vacate conviction where prosecutor made heated comments in response to defense counsel's claim that the Government was "cheating").

[5] *See United States v. Medrano*, 836 F.2d 861, 865-66 (5th Cir. 1988) ("We find that the prosecutor's remarks were made in direct response to defense counsel's closing remarks, which assailed the credibility of the prosecution's witnesses. The prosecutor's remarks implied that defense counsel could have used the reports to impeach witnesses if their statements were inconsistent. We find that the prosecutor's remarks did not affect a 'substantial right' of [the defendant], and there was no error.").

convictions.[6] For example, Avila's and Lozano's border-crossing histories belied that the two had met in Reynoso shortly before crossing and suggested that Lozano had been "scouting" the Hidalgo border crossing. Avila possessed a large sum of cash despite being unemployed, and Lozano had none despite being the only person capable of paying taxes on the beer. The jury learned that Avila's father in fact has a criminal record for drug trafficking, as well as the suspicious circumstances of his travel from Nuevo Laredo to Reynoso to meet with Avila the day before she ostensibly was to travel to Laredo—directly across the border from Nuevo Laredo—to be with her mother. This evidence, as well as the value and amount of recovered methamphetamine, all militates against Avila's prejudice-related arguments. *See United States v. Gonzalez*, 700 F.2d 196, 204 (5th Cir. 1983). Because the record as a whole sufficiently supports Avila's convictions, we conclude that the prosecutor's remarks do not "cast serious doubt on the correctness of the jury's verdict," *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008) and that this issue does not meet the requirements for reversal under plain-error review.

## Conclusion

Sufficient evidence supported the jury's verdict. The district court properly included a deliberate ignorance instruction in the jury charge. In context, the prosecutor's challenged comments responded to issues opened by defense counsel and, although error, did not affect Avila's substantial rights. Accordingly, we conclude cumulative error doctrine does not apply and AFFIRM Avila's convictions.

---

[6] *See Morris*, 568 F.2d at 402 ("Although the prosecutor's statement constitutes error, it is not reversible error. Error must be regarded as harmless if, upon an examination of the entire record, substantial prejudice to the defendant does not appear." (citing *Berger v. United States*, 295 U.S. 78, 82 (1935))).