**ARBUCKLE v. UNITED STATES.**

No. 8700.

United States Court of Appeals
District of Columbia.

Argued Oct. 11, 1944.

Decided Nov. 13, 1944.

See also, D.C., 48 F.Supp. 537.

Mr. Warren E. Magee, of Washington, D. C., with whom Mr. Paul J. Sedgwick, of Washington, D. C., was on the brief, for appellant.

Mr. Charles B. Murray, Assistant United States Attorney, of Washington, D. C., with whom Mr. Edward M. Curran, United States Attorney, of Washington, D. C., was on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

Appellant was convicted of ten separate embezzlements of money of the United States.[1] He had been appointed in 1935 as Manager of the Senate Restaurant, located in part in the Capitol and in part in the Senate Office Building. The appointment was made by Senator Neely, Chairman, on behalf of the Rules Committee of the Sen-

---

[1] Criminal Code, Sec. 47, U.S.C.A., Title 18, § 100.

"Whoever shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

ate. In addition to appellant, there were also employed one King who was then, and for many years had been, Assistant Manager, and a Mrs. Payne, who was Cashier. The salaries of all three were paid by the United States. The moneys received in the operation of the restaurant came first into Mrs. Payne's hands. After checking the cash register with the amount on hand, she would turn over the money daily to Mr. King, who would from time to time deposit it in an account in the Anacostia Bank, opened in the name of "Senate Restaurant, United States Capitol," by authority of the Rules Committee. Payment for food purchased, wages of employees, and incidental expenses was made by King, either in cash or by check drawn by him on the account. The deficit between the income and outgo was covered by congressional appropriation.

On the 1st of September, 1938, King left Washington on his vacation and was gone until the 1st of October. In his absence the daily receipts of the restaurant were delivered to appellant by Mrs. Payne in separate envelopes. This method, Mrs. Payne testified, was followed by her as the result of instructions given her by appellant. The undisputed evidence is that Mrs. Payne did deliver to appellant between the 7th of September and the 1st of October envelopes containing money, including in one instance a small check, in the aggregate sum of $1,925. Admittedly, none of the funds so delivered were deposited in bank by appellant, and the issue in the case depended upon whether the jury believed appellant's statement that he turned over the envelopes with the currency to King on his return, or King's statement that appellant never delivered any of the envelopes or any part of the contents of the envelopes to him at any time, but, on his demand for the same, promised to make an accounting at a subsequent time.

The case was submitted to the jury on a well considered charge of the trial court and a general verdict of guilty was returned. On the appeal to this Court, thirty-six separate grounds of error are assigned, but only four are pressed, and we shall confine our discussion to these.

■ (1) Appellant insists that the testimony fails to establish the crime of embezzlement. The basis of this is that the evidence shows that appellant had only the custody, and not the legal possession, of the funds described in the indictment. It is quite true that Senator Neely in employing appellant instructed him to leave King in charge of the funds, and from this it is said that the result of the delivery of the money to appellant to deposit in the bank would confer upon him custody as distinguished from legal possession, and that a subsequent conversion would be larceny and not embezzlement. But we think, in the facts of this case, this does not follow. Appellant was the manager and was responsible to the United States, acting through the Chairman of the Senate Committee, for the carrying on of the business of the restaurant. While King was on duty, undoubtedly, the deposit of the money in bank and its disbursement were primarily his duties, but just as certainly, when King was ill and unable to attend to his duties, or when he was on vacation, it became appellant's duty, as the official head of the enterprise, to see that the funds were properly collected and properly accounted for. The nature and character of money or currency make it seldom susceptible of mere custody, unless specific or physical restrictions as to its use or disbursement are coupled with its delivery. If on these occasions appellant chose, as he did here, to designate himself as the person into whose hands the restaurant receipts should be placed, it cannot be doubted that such an order, in the circumstances, carried with it its own authority, and that possession of the money was received by him in his official capacity and subject to his official discretion. In this case a conversion of it would unquestionably constitute embezzlement.

■ (2). It is next claimed that the evidence fails to establish that the moneys involved were the "moneys" or "property of the United States," within the meaning of Section 47 of the Criminal Code. United States v. Mason, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133, is cited to sustain this point, but we think it not apposite. The Mason case involved fees received by the clerk of a court in the discharge of his duties as clerk. During the period in question these fees were not received by the clerk as moneys of the United States, but, as is pointed out in the opinion, as amounts allowed to him as his compensation and office expenses under the statutes defining his rights and duties. And, as the court then said, where a surplus remained payable to the United States, the clerk was as to this surplus not

trustee for the United States, but a debtor of the United States.

In the instant case, as we have seen, the moneys received in the restaurant were used, so far as they would go, toward the payment of the ordinary expenses, not including the salaries of the officials charged with the duty of running the restaurant. If, as was invariably the case, the amounts so received were not enough, the United States were liable for and actually did supply the balance. In these circumstances, it may very well be that while these moneys were not public moneys in the sense in which the ordinary revenues of government are public moneys, they were nevertheless moneys of the United States in the sense of moneys which the United States controlled and which, through an instrumentality of the United States created by Congress, they disbursed. Richmond F. & P. R. Co. v. McCarl, 61 App.D.C. 290, 293, 62 F.2d 203; Minis v. U. S., 15 Pet. 423, 448, 10 L.Ed. 791; Loewe v. U. S., 9 Cir., 135 F.2d 622.

 (3) Counsel earnestly contend that the trial court erred in failing to direct a verdict of not guilty. The theory of this is that a fair consideration of the testimony of King will not support a conviction. As we stated in the forepart of this opinion, the Government's case turns upon the acceptance by the jury of King's testimony. And it is not too much to say that a fair evaluation of his testimony and his manner of testifying leave much to be desired. As it appears in the record, it presents the picture of a shifty witness, whose statements and explanations are not altogether satisfactory or convincing. On the contrary, appellant's testimony, on its face, has all the appearance of candor and truth, and if that were all, the contrast might have tipped the scales in appellant's favor. But, unhappily for him, he undertook to bolster his case by testifying that at the time of delivery of the money to King there was present an associate of his, who was then in court and who would testify to delivery of the money and its acceptance by King in full acquittal of appellant's obligation in that regard. And, sure enough, appellant was followed on the stand by this witness, Robert C. Henderson, who did testify that he was present and saw appellant deliver to King the several envelopes with the money, which the latter then and there compared with Mrs. Payne's statement of account, and found to be correct. But, in cross-examination, the prosecution was able to show, through letters and papers of Henderson's that he was not in Washington at the time in question, but was then in Canada, and could not possibly have witnessed the transaction. And this Henderson ultimately was forced to admit was true. In this state of affairs it was for the jury to determine whether the giving of this testimony was an impudent, wilful and vicious subornation, or was a mistake of memory explicable by lapse of time. Obviously, the jury refused to accept the alternative and in this view, reasonably enough, might properly have disregarded the whole of appellant's testimony as unworthy of belief. In the circumstances, it is not for us to reach a different conclusion. The motion to direct a verdict was, therefore, correctly refused.

 (4) This brings us, then, to the most perplexing aspect of the case. Mrs. Payne had testified that although a custom existed in the restaurant of cashing checks in small amounts for Senators or Senators' secretaries, she had not felt authorized during the period of King's absence in continuing this practice, and that she was quite certain she had cashed in September not more than one or two checks, probably only one. Her recollection in this respect is corroborated by the pencilled receipts, with appellant's initials, for envelopes containing the money. These were introduced in evidence and were all in the same form, appropriately dated and reading:

"Received from Mrs. Payne for deposit $......" An exception was the receipt dated 9-22-38, which was enlarged as follows:

"Received from Mrs. Payne for deposit $90.00 cash & check for $10.00 Sen. O'Mahoney."

This indicated that on September 22nd appellant had received from Mrs. Payne, as part of the restaurant funds, Senator O'Mahoney's check for $10. The obvious question then was, what had he done with it? And this question the prosecuting attorney made the most of in his closing argument. Referring to the Senator's check and its delivery to appellant, he aptly pointed out to the jury that if appellant had delivered the contents of the envelopes to King, as appellant insisted he had, this check, when cashed or deposited, would have appeared

by King's endorsement as having been received by him from appellant, and the fact that it was not so shown was convincing proof that appellant's testimony was untrue. And the conclusion is so obvious that it must have had great weight with the jury in their determination of guilt. However, it now appears that shortly after the trial and within the permissible time, counsel for appellant moved for a new trial on the ground of newly-discovered evidence, and on this motion filed an affidavit, the substance of which is that he was employed in the case by reason of the illness of appellant's counsel of record "only several days" before trial; that he spent these few days diligently preparing for trial and during all of that time the personal records and files of appellant and the records of the Senate Restaurant were in the custody and control of the United States Attorney; that he never saw the receipts given by appellant to Mrs. Payne prior to the trial and did not know that one of the receipts actually identified the $10 check of the Senator; that he did not know that Mrs. Payne would testify that she had delivered a check to appellant, and hence had no opportunity of tracing the disposition of Senator O'Mahoney's check until evidence of it was introduced on the trial, but that immediately after the verdict he began an investigation in an effort to locate the check and then, for the first time, discovered that the identical check, with King's endorsement, had been deposited by King in the Anacostia Bank to the restaurant account on October 7, 1938.

Counsel's affidavit was supported by Senator O'Mahoney, who testified on the hearing that the check for $10 cashed at the restaurant, dated September 17th, was the only check issued by him and cashed at the restaurant during the month of September.

The vital importance of the fact on which the motion is based is apparent, when it is remembered that King's testimony was that appellant had turned over *none* of the contents of *any* of the envelopes which appellant had received from Mrs. Payne. This testimony of King's was false, if in fact he received from appellant Senator O'Mahoney's check, which was shown to have been delivered to appellant by Mrs. Payne. And King's endorsement of this check and his deposit of it in the bank in October, unless it is susceptible of some explanation which does not appear, could only be the result of the delivery of the check to him by appellant. If he did in fact receive the check, the court and jury might reasonably have assumed that appellant's testimony of delivery to him of the envelopes with their contents was true and his (King's) denial false. Accordingly, the newly-discovered evidence that King had in fact received the check and had nevertheless denied it, seems on the present record convincing of the untruth of his testimony and is, of course, vital to the defense. In this view, the only question is whether failure to produce this evidence on the trial is sufficiently accounted for, and we think it is. We have, therefore, a case in which the testimony of both the defendant and of the prosecution's witness—the only two persons who know the true facts—is shown in important aspects to be untrue and perhaps in these circumstances we should leave the case where we find it. But in refusing to grant a new trial and in imposing sentence, the trial judge, in whose judgment and discretion we have the utmost confidence, suspended execution of the sentence and admitted appellant to probation. It is unthinkable to us that he would have taken such action unless he considered that there was at least reasonable doubt whether appellant's testimony, in the respect which we have pointed out, was purposely false rather than a mistake of memory. If it was purposely false, appellant's previous good character, which was shown by reliable witnesses, certainly would not have justified condonation of a deliberate perjury, coupled with a vicious attempt to obstruct the administration of justice. And this also must have been the reasoning of the trial judge. Accordingly, we have concluded that our duty is to direct a new trial.

This leaves only to be disposed of the Government's point that the appeal is not permissible because after sentence appellant accepted parole. We think this question is disposed of against the Government's contention by the opinions of the Supreme Court in Korematsu v. U. S., 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497, and Berman v. U. S., 302 U.S. 211, 213, 58 S. Ct. 164, 82 L.Ed. 204.

Reversed and remanded for a new trial.