UNITED STATES of America

v.

John W. MILTON and James Milton, Appellants.

UNITED STATES of America

v.

John W. MILTON, Appellant.

Nos. 91–3238, 91–3239 and 93–3017.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1993.

Decided Nov. 2, 1993.

William J. Murphy argued the cause and filed the briefs for appellant John W. Milton.

W. Gregory Spencer, Asst. Federal Public Defender (appointed by the court for appellant James Milton) argued the cause for amicus curiae. With him on the brief was A.J. Kramer, Federal Public Defender.

David E. Green, Sr. Litigation Counsel, U.S. Dept. of Justice, argued the cause and filed the brief for appellee.

Before: EDWARDS, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The brothers John and James Milton were convicted, after a jury trial, of stealing "money ... of the United States or of any department or agency thereof," in violation of 18 U.S.C. § 641; aiding and abetting the making of materially false statements, in violation of 18 U.S.C. § 1001; and conspiracy, in violation of 18 U.S.C. § 371. The court sentenced John Milton to concurrent terms of 37 months' imprisonment on each count and, after reconsideration, ordered him to pay $43,751.82 in restitution; the court sentenced James Milton to concurrent terms of 33 months' imprisonment and ordered him to pay $18,000 in restitution. John appeals from the judgment of conviction and from the court's order, entered after an evidentiary hearing, finding that his retained counsel had adequately represented him. James appeals from the judgment of conviction and the district court's application of the Sentencing Guidelines to his conviction on the conspiracy

count. We consolidated the appeals and now affirm.

## I

In 1986, John Milton served as a staff attorney with the Equal Employment Opportunity Commission. At his suggestion, the EEOC brought a contempt action against CW Transport Inc., claiming that it had violated a consent decree prohibiting employment discrimination. The violations allegedly occurred at the company's Chicago/Bridgeview terminal. With John Milton representing the EEOC, the parties settled the action in June 1987. Under their written agreement, which John Milton helped negotiate and to which he affixed his signature, the trucking company was to deliver a $1 million check made out to the EEOC. The company's payment was irrevocable. The EEOC was to deposit the money in a claims account, from which backpay awards would be made to unsuccessful minority job applicants at the Chicago/Bridgeview terminal between 1974 and 1987. The EEOC was to obtain from each former job applicant sharing in the settlement a signed statement releasing CW Transport from any further liability on any discrimination claim. The parties agreed upon a form entitled "COMPLETE AND FINAL RELEASE OF ALL OF MY CLAIMS" and attached it to the written settlement agreement.

John Milton deposited the $1 million check with E.F. Hutton & Company in Washington, D.C., in an account entitled "John W. Milton, Esq., and such other person designated by the EEOC as EEOC Representative for Account Claimants in EEOC vs. CW Transport (Case 86C 680C)." E.F. Hutton agreed to make disbursements from the account on Milton's written instructions. John Milton and another EEOC employee had the responsibility of determining the eligibility of claimants and the amount of their share of the fund.

The evidence showed that of the approximately 200 claimants paid from the settlement fund, one group recruited by John Milton and another recruited by his brother

James submitted false claims and then shared the proceeds with one or the other of the brothers. The first group consisted of three men from Shreveport, Louisiana (the "Shreveport claimants").[1] John Milton had represented these men on behalf of the EEOC in an unrelated and unresolved case against another trucking company in the early 1980's. John enlisted the Shreveport claimants, telling them that their case had been settled and that they were entitled to receive money from that settlement. He sent a claims form to each of them and explained that CW Transport had merged with the other trucking company, or that there had been a class action settlement involving both companies.

The second group of false claimants, six individuals from New York and Connecticut (the "New York claimants"), were friends or acquaintances of James Milton. James promised each of them between $1,000 and $1,500 for signing some papers in a lawsuit conducted by his brother.

On October 15 or 16, 1987, the claimants in both groups, accompanied by one or both of the Miltons, picked up their checks at E.F. Hutton's Washington office, signed claims release forms and then cashed their checks at a nearby bank. Each false claimant handed over his cash, between $5,700 and $6,500, to John or James, who then handed back $900 to $1,700.

In February 1988, John Milton sent another check from the settlement fund to the Shreveport claimants, made out in the maiden name of the wife of one of the Shreveport claimants. The check, sent pursuant to a promise Milton made in October 1987, was meant to cover the Shreveport claimants' travel expenses and the tax liability of one of the Shreveport claimants.

## II

### A. The Convictions Under 18 U.S.C. § 641

#### 1. Government Money

■ The Miltons' initial argument for setting aside their convictions under 18 U.S.C. § 641 is in the form of confession and avoid-

---

1. Another claimant from Shreveport actually had applied for work with CW Transport.

ance: the money they pilfered was not, as section 641 requires, "money ... of the United States." Therein lies a puzzle: if the $1 million was not money of the United States, whose money was it? Certainly not CW Transport's. The company relinquished any ownership interest. Suppose no claimant ever appeared; CW Transport still could not recoup a cent. The money surely was not E.F. Hutton's. It functioned only as a repository for the funds. One might say the $1 million belonged to potential legitimate claimants, whomever they turned out to be. Most of the money eventually would wind up in their collective pockets, less federal, state and local taxes withheld. But whose money was it before these people came forward and received their due? The most likely candidate is the one the Miltons would exclude—the United States, or in the words of section 641, "an agency thereof," the EEOC.

The government supports this result, and the Miltons' convictions under section 641, on the ground that "from the time it received the check until the money was disbursed—a period that included the time the money was stolen by the Miltons—the EEOC exercised complete supervision and control over the Settlement Fund." Brief for Appellee at 17.[2] The Miltons, citing several federal appellate decisions and two ancient Supreme Court opinions (*United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910); *United States v. Johnston*, 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925)), counter that supervision and control is not the test here; that the district court erred in so instructing the jury;[3] that the key is ownership; and that supervision and control comes into play only when money originating with the government is in someone else's hands (not the case here, the Miltons say) and the question is whether the government has retained an ownership interest in it.

Not much can be made of *Mason* or *Johnston*, certainly nowhere near as much as the Miltons would like. At the time of *Mason*,

federal district court clerks collected fees, deducted their fixed salary and expenses, and remitted the surplus to the United States. 218 U.S. at 522–23, 31 S.Ct. at 30–31. District court clerk Mason skipped the remitting step. Did he thereby embezzle money of the United States, under an earlier version of section 641? No, the Supreme Court held. The surplus fees were not public money, and clerks were not bound to remit anything to the government until they filed their half-yearly returns showing the amounts due, if any. Even at that point "the clerk is not trustee but debtor." 218 U.S. at 531, 31 S.Ct. at 34. Far from reciting any broad propositions of the sort the Miltons suggest, the Court in *Mason* rested its decision on narrow grounds. The fees, when the clerk collected them, were not public moneys but were in the nature of wages and reimbursement for expenses. *Id.* at 530, 31 S.Ct. at 33. The clerk had a duty to pay over any surplus to the government when he filed his return, but the indictment failed to allege that the duty had arisen. *Id.* at 531, 31 S.Ct. at 34. *Johnston* is much to the same effect. The defendant collected admission fees for boxing matches but failed to remit the federal taxes on the fees. He could not be properly charged, the Court ruled, with embezzling money of the United States. Those required to pay this tax were in the same position as "others answerable for a tax," that is, each was "debtor and not a bailee." 268 U.S. at 227, 45 S.Ct. at 496. In this case, of course, the Miltons were neither.

This brings us to the federal appellate decisions. As to the meaning of "money ... of the United States," the leading case in this circuit, indeed the only case, is *Arbuckle v. United States*, 146 F.2d 657 (D.C.Cir.1944). The Senate Restaurant deposited receipts from its customers in a private bank, as the Senate Rules Committee had authorized. The deposits were used to pay for food and other expenses, but when, "as was invariably

---

2. The EEOC may have been in a position like that of a trustee having legal title to the res of a trust. *See* 1 GEORGE G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 1, at 4–5 (2d ed. 1984). The government, however, chose not to rely on this theory and the jury instructions do not reflect it.

3. The district court told the jury "if you find that the United States exercised supervision and control over the distribution of the one million dollar settlement fund, then you may find that the one million dollars was money of the United States."

the case," the restaurant operated at a deficit, a "congressional appropriation" would cover the shortfall. 146 F.2d at 658–59. Arbuckle, the restaurant's manager, diverted some of the restaurant's receipts to himself and, for this, was tried and convicted of embezzling money of the United States under a predecessor to section 641. The court affirmed his conviction, holding that receipts of the Senate Restaurant were "moneys of the United States in the sense of moneys which the United States controlled and which, through an instrumentality of the United States, created by Congress, they disbursed." *Id.* at 659.

*Arbuckle,* as the law of this circuit, stands against the Miltons' position that "[i]f the money or property did not originate with the federal government, the supervision and control test is not applicable...." Brief of Appellant John W. Milton at 23. Customers of the Senate Restaurant, whether elected officials or not, were spending their money, not the government's, when they purchased meals. The government therefore did not "originate" the money in *Arbuckle.* In that respect the restaurant receipts were like the $1 million in this case. *Arbuckle* is significant for another reason. The Miltons make much of the fact that the money here not only originally came from a private party, but also was to be distributed to private parties. But the same can be said of the restaurant receipts in *Arbuckle.* These were used to cover such expenses as the cost of food; and we think it safe to assume that the Senate Restaurant's suppliers, or at least some of them, were private vendors. 146 F.2d at 658.

The Miltons prefer cases from other circuits invoking the sort of test Judge Easterbrook summarized for the court in *United States v. Reynolds,* 919 F.2d 435, 438 (7th Cir.1990), *cert. denied,* 499 U.S. 942, 111 S.Ct. 1402, 113 L.Ed.2d 457 (1991): "if the United States supplies the funds and exercises supervision and control over their use in the hands of grantees, they remain 'money ... of the United States.'" *See also United States v. Evans,* 572 F.2d 455 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978); *United States v. John-*

*son,* 596 F.2d 842 (9th Cir.1979); *United States v. Wheadon,* 794 F.2d 1277 (7th Cir. 1986), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1307, 94 L.Ed.2d 161 (1987); *United States v. Lanier,* 920 F.2d 887 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991). The test applies when the government has furnished funds to a non-federal entity, typically a local agency. The test then measures whether the government's turning over of the funds transformed the money into something other than "money ... of the United States." To take an example drawn from this case, suppose a burglar broke into a claimant's home and stole some of his backpay award. This would not constitute a violation of section 641. The money turned over to the claimant was by then no longer under governmental supervision or control. On the other hand, if we move back one step and examine unclaimed money still in the E.F. Hutton account—money the Miltons were charged with stealing—the result is different. The EEOC supplied that money to E.F. Hutton and, as the evidence showed, the EEOC maintained supervision and control over it. It therefore constituted money of the United States.

The Miltons protest that the money in the account came from CW Transport, so it is wrong to treat the EEOC as the source. There are two answers. First, the $1 million the EEOC deposited with E.F. Hutton did not belong to C.W. Transport. The check was made out to the EEOC. Having paid the EEOC, the trucking company relinquished ownership. While the EEOC was bound to distribute the money in accordance with the settlement agreement, that put the agency in no different position than any other federal agency required by law to disburse funds in a certain way. Second, as we have discussed, the holding in *Arbuckle* plainly indicates that section 641 applies even though a private entity, here the trucking company, originally paid the money to the government. *See also United States v. Benefield,* 721 F.2d 128 (4th Cir.1983). Indeed, in the final analysis it might be said that all government money is derived from private entities. But we need not pursue that line of

reasoning to sustain the district court's instruction here.[4]

### 2. Proof of Loss

■ The Miltons' next objection to their conviction under section 641 stems from the holding of *United States v. Collins,* 464 F.2d 1163, 1165 (9th Cir.1972), an embezzlement case, that "[i]t is an essential element of the crime of stealing Government property in violation of 18 U.S.C. § 641 that the Government have suffered an actual property loss." We are not quite sure what the quoted passage is supposed to signify. There would be no "actual" property loss if stolen property is later recovered and returned. Does *Collins* mean that larceny or embezzlement therefore had not been committed? *See Elmore v. United States,* 267 F.2d 595, 601 (4th Cir.), *cert. denied,* 361 U.S. 832, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959); *Dobbins v. United States,* 157 F.2d 257, 259 (D.C.Cir.), *cert. denied,* 329 U.S. 734, 67 S.Ct. 99, 91 L.Ed. 634 (1946). The Miltons take *Collins* in a somewhat different direction. They read it to mean that their thievery did not come within section 641 because the EEOC did not lose a dime. By their lights, it was the potential legitimate claimants, not the EEOC, whose ox they gored. But the Miltons certainly deprived the EEOC of its use of the money for the money's intended purpose—compensating victims of employment discrimination, a purpose plainly within the agency's statutory mission. 42 U.S.C. §§ 2000e–5, 2000e–6. That would seem to be sufficient to satisfy *Collins,* assuming proof of loss is necessary.

The assumption, however, is one we are unwilling to make. Two courts of appeals have expressly rejected the *Collins* proof-of-loss requirement (*United States v. Barnes,* 761 F.2d 1026, 1032–36 (5th Cir.1985); *United States v. Bailey,* 734 F.2d 296, 301–05 (7th Cir.), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984)), and the Ninth Circuit has itself recast *Collins* to mean that if someone other than the government feels the pinch, this tends to indicate that the stolen property was not the government's. *See United States v. Faust,* 850 F.2d 575, 580 (9th Cir.1988); *Johnson,* 596 F.2d at 846. No one, including the court in *Collins,* has explained why Congress would have made property loss an element of a section 641 offense when, historically, there was no such element. *Barnes* reviews that history and, in a thoroughly convincing opinion, concludes that proof of the government's loss is unnecessary in a section 641 prosecution. 761 F.2d at 1032–36. No useful purpose would be served by repeating the analysis. It is enough to say that, for the reasons given in *Barnes* and in *Bailey,* we reject *Collins* and join the Seventh and Fifth Circuits in their interpretation of section 641.[5]

---

**4.** It is true, as the Miltons stress, that the EEOC's "intent to maintain an ownership interest in these funds" is not reflected in a statute or regulation (Brief of Appellant John W. Milton at 25). But we are not concerned with a case in which the money has passed out of the agency's hands. Then the issue would depend upon whether the legal strings attached to the money gave the agency sufficient continuing control of its use. In this case it is enough that the settlement agreement and the arrangements with E.F. Hutton, rather than any statute or regulation, reflected the EEOC's complete supervision and control over the $1 million paid to the agency.

**5.** In *United States v. Coachman,* 727 F.2d 1293, 1302 (D.C.Cir.1984), a decision the parties failed to bring to our attention, we said:

> An essential element of false claims [in violation of 18 U.S.C. § 287] is that the accused has presented a claim knowing it to be false ... but there is no requirement that the claim has actually been honored. Theft of governmental property [in violation of 18 U.S.C. § 641], on

the other hand, is essentially larceny from the Government, and contrasts with false claims in that the accused must actually have succeeded in wrongfully separating the Government from its money or other valuables....

At this point, the court dropped a footnote citing *United States v. Evans,* 572 F.2d 455, 471 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), to which it added the parenthetical "(Government must establish actual property loss under § 641.)." 727 F.2d at 1302 n. 41.

We do not believe *Coachman's* reference to *Evans* binds this court to the Miltons' interpretation of § 641. The relevant holding of the court in *Coachman* is embodied in its textual statement, rather than in the footnote, and that statement—"the accused must actually have succeeded in wrongfully separating the Government from its money or other valuables"—is itself unimpeachable. Furthermore, the portion of *Evans* (572 F.2d at 471) the footnote cited was dictum, as the Fifth Circuit explained in *Barnes,* 761 F.2d at 1032–33, standing merely for the proposition

## B. Section 1001

The Miltons raise two objections to their convictions under 18 U.S.C. § 1001 for aiding and abetting the making of false statements in the executed claims release forms.[6] The first is that the signed forms were literally true; the second is that the EEOC had no authority to collect the claims release forms, and thus no false statement could have been made, as section 1001 requires, "in any matter within the jurisdiction of any department or agency of the United States...."

The defense of literal truth applies to section 1001 prosecutions,[7] but the Miltons proposed no jury instructions to this effect; they raised no objections on this ground to the instructions that were given; and at no time did they argue the defense to the court or to the jury. *See* Rule 30, Fed.R.Crim.P. To accept their argument now, the government thinks we must find that the district court committed plain error (*see* Fed. R.Crim.P. 52(b)). We agree with the Miltons, however, that they preserved the objection. Falsity is an element of the section 1001 offense. Through their motion for judgment of acquittal at the close of the case, the Miltons raised the general claim of insufficient evidence to support their convictions. We will therefore treat their contentions regarding literal truth as arguments that the government failed to prove the falsity element of section 1001 beyond a reasonable doubt.

As to the alleged false statements contained in the forms, the Miltons say the Shreveport and New York claimants, who had never applied to CW Transport, were nevertheless reciting the literal truth when they signed the forms stating "[c]laimant *claims* to have been an applicant for employment at CW Transport, Inc. (hereinafter "CWT") at CWT's Chicago/Bridgeview terminal...." (emphasis added). The verb "claim," according to the Miltons, means merely "to demand recognition of," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 414 (1976), as in "he claimed the title of supreme potentate." These people were thus merely demanding to be recognized as former applicants for a job with the company, not asserting that they in fact had applied for employment. "Claim," the government replies, means instead "to state to be true; assert or maintain" (AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 246 (1981)), as in "he claims to have discovered a cure for cancer." When they signed their forms, the Shreveport and New York claimants were therefore falsely stating that they in fact had applied for jobs with CW Transport.

Obviously these are not the only definitions of the word "claim" and the authorities mentioned are scarcely the only sources one might consult. *See, e.g.*, R.W. HOLDER, THE FABER DICTIONARY OF EUPHEMISMS 56 (1989), defining "claim" as "to steal." Since the dictionaries establish that "claim" could have several definitions, how might its meaning here be discovered? Only by considering the term in context, taking into account the setting in which it appeared and the purpose for which it was used. This was a matter for the jury. In the analogous context of perjury

---

that in a § 641 prosecution, the jury has the responsibility of finding that the converted property was of a "federal nature," rather than for the idea that proof of loss is an essential element of the offense.

**6.** John Milton was convicted on nine counts charging violations of § 1001, one for each false claimant. James Milton was convicted on six such counts, one for each of the New York claimants. The statute is as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1001.

**7.** *See, e.g., United States v. Dale*, 991 F.2d 819, 832–33 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993) (No. 93–131); *United States v. Gahagan*, 881 F.2d 1380, 1383–84 (6th Cir.1989); *United States v. Vesaas*, 586 F.2d 101 (8th Cir.1978); *United States v. Lozano*, 511 F.2d 1 (7th Cir.), *cert. denied*, 423 U.S. 850, 96 S.Ct. 94, 46 L.Ed.2d 74 (1975); *United States v. Diogo*, 320 F.2d 898 (2d Cir.1963); *cf. Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

prosecutions, we have held that it is up to the jury to determine how the defendant construed the question or answer and to decide, in that light, whether the defendant knowingly gave a false answer. *United States v. Sampol,* 636 F.2d 621, 655 (D.C.Cir.1980); *United States v. Haldeman,* 559 F.2d 31, 104 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Chapin,* 515 F.2d 1274, 1289 (D.C.Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). The jury instructions in the Miltons' case were to this effect. The court first told the jury of the government's burden of proving beyond a reasonable doubt that the Miltons made or caused to be made a "false or fictitious" "statement or representation" and that "the false or fictitious statement was made ... knowingly...." The court then instructed that "[a] statement or representation is 'false' or 'fictitious' if untrue when made, and known at the time to be untrue by the person making it or causing it to be made." Viewing the evidence in the light most favorable to the government, we believe a rational juror considering the context in which the statements were made—to obtain a sum of money in return for releasing CW Transport from further liability for its refusal to hire the signer of the form—could find beyond a reasonable doubt that the forms in question, with their use of the verb "claims," contained false assertions that the claimants had in fact applied to the company.

■ The Miltons' second argument for upsetting their § 1001 convictions is that the claims release forms do not fall under the EEOC's jurisdiction. *United States v. Rodgers,* 466 U.S. 475, 480, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984), instructs us not to interpret "jurisdiction" in section 1001 narrowly or technically. *See also United States v. Hansen,* 772 F.2d 940, 943 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986). It is sufficient if there is a "statutory basis" for the agency's request

for the information alleged to contain the false statement. *United States v. Rodgers,* 466 U.S. at 481, 104 S.Ct. at 1947. The EEOC's administration of the settlement fund, a fund created as a result of litigation instituted by the EEOC, had a statutory basis. The EEOC is authorized to bring suit to redress employment discrimination, *see* 42 U.S.C. § 2000e–6, and to use informal procedures to settle such suits. *See* 42 U.S.C. § 2000e–5(b). If the EEOC can bring lawsuits, if it can settle the lawsuits it brings, if it is charged with the duty of combatting employment discrimination, if its objective is to protect those who are subject to such discrimination—if it had a statutory basis to do all these things, and there is no doubt that it did, the EEOC had a statutory basis for requiring claimants to submit forms attesting to their entitlement to a portion of the funds.[8]

## C. Grand Jury Testimony

■ Anita Jones, one of the New York claimants, testified before the grand jury that she was a tenant in a building owned by James Milton, that James took her to Washington, D.C., in 1987; that she signed some papers and received a check for $5,913.07; and that the next day she cashed the check, gave the proceeds to James or his brother and received $1,100 for her efforts.

In its case-in-chief, the government called Jones and asked her about her relationship with James Milton and about her trip from New York to Washington, D.C., to obtain a share of the settlement fund. After Jones testified that she could remember almost nothing about the trip or what she told the grand jury, the court granted the government's motion to admit her grand jury testimony under Rule 801(d)(1)(A) of the Federal Rules of Evidence on the ground that it was inconsistent with her trial testimony.

Rule 801(d)(1)(A) provides that a statement is not hearsay if

---

8. The government's case against the Miltons would satisfy even the requirement, propounded in *United States v. Facchini,* 874 F.2d 638, 641 (9th Cir.1989) (en banc), that "jurisdiction" in section 1001 means that "a direct relationship obtains between the false statement and an au-

thorized function of a federal agency...." But we leave to another day the question whether *Facchini* is good law. *See United States v. Herring,* 916 F.2d 1543, 1546–47 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991), rejecting *Facchini.*

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition....

As Judge Friendly stated for the court in *United States v. Marchand*, 564 F.2d 983, 999 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), "if a witness has testified to [certain] facts before a grand jury and forgets ... them at trial, his grand jury testimony ... falls squarely within Rule 801(d)(1)(A)." *Marchand* attracted a wide following among state and federal courts (*see* Note, *The Forgetful Witness*, 60 U.Chi.L.Rev. 167, 189 (1993)), including *United States v. Williams*, 737 F.2d 594, 608 (7th Cir.1984), on which the district court relied in this case. Yet even after *Marchand* some doubt remained. Would the witness truly be "subject to cross-examination," as the rule required, if the witness could not recall the basis for his prior testimony? *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), in addressing Rule 801(d)(1)(C) (eyewitness identification of a person) and the Sixth Amendment confrontation clause, settled this question. The Court said that "[o]rdinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions," that Rule 801(d)(1) used this phrase in its ordinary sense, and that the Constitution did not bar introduction of the forgetful witness' prior statement. 484 U.S. at 560–62, 108 S.Ct. at 843–44.

The Miltons nevertheless insist that Jones' taking the stand and responding to defense counsel's questions satisfied neither the rule, nor the Sixth Amendment's confrontation clause, because Jones "could not remember the events underlying her prior testimony, [ ]or the fact that she had given it." Brief of Appellant John W. Milton at 13. The idea is that if the witness recalls his prior testimony

while forgetting why he said what he did, cross-examination is more meaningful than if, like Jones, the witness does not even recall his earlier testimony. We believe the Supreme Court in *Owens* put this argument to rest. It is true that in *Owens* the witness at least recalled having identified the defendant. 484 U.S. at 556, 108 S.Ct. at 840. But the Court did not restrict its reasoning to such situations. Instead, the Court "agree[d] with the answer suggested" in "Justice Harlan's scholarly concurrence" in *California v. Green*, 399 U.S. 149, 188, 90 S.Ct. 1930, 1950, 26 L.Ed.2d 489 (1970), that "a witness' inability to 'recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence.'" 484 U.S. at 558, 108 S.Ct. at 841. The accused has been "confronted with the witnesses against him," as the Sixth Amendment demands, so long as the prosecution produces the witnesses and the witnesses answer defense questions. "[S]uccessful cross-examination is not the constitutional guarantee." 484 U.S. at 560, 108 S.Ct. at 843. When a witness has forgotten the basis for and the giving of testimony under oath in an earlier proceeding and that testimony is then introduced into evidence, defense questioning, though impaired, is not futile for the reasons given in *Owens*. It is still possible to bring out on cross-examination the "witness' bias, his lack of care and attentiveness ... and even (what is often a prime objective of cross-examination) the very fact that he has a bad memory." *Id.* at 559, 108 S.Ct. at 842 (citation omitted). And that is precisely what took place in this case. Defense counsel elicited testimony from Jones that tended to discredit her grand jury testimony. She admitted that when she appeared before the grand jury she was addicted to drugs, was suffering from withdrawal and was on the verge of a nervous breakdown. Jones also said that she did not remember giving any of the money paid to her by E.F. Hutton to the Miltons.[9]

---

9. *United States v. DiCaro*, 772 F.2d 1314, 1323 (7th Cir.), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1985), stated that "in

many or perhaps most cases in which the witness suffers a total memory lapse concerning both the prior statement and its contents, the witness can-

## D. Application of Sentencing Guidelines

 James Milton alone contends that the district court should not have used the Federal Sentencing Guidelines in determining his sentence for conspiracy, the only count for which he received a guidelines sentence (of 33 months, to run concurrently with his sentence on the other counts). A conviction for a conspiracy beginning prior to November 1, 1987, the effective date of the Guidelines, but continuing after that date is subject to the Guidelines. *See United States v. Dale,* 991 F.2d 819, 853 (D.C.Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). James therefore can prevail only if the conspiracy here ended before November 1, 1987.

 The question whether the Guidelines apply is for the court; the court resolves factual issues bearing on the question by using the preponderance-of-the-evidence standard. *Dale,* 991 F.2d at 854. The evidence here was sufficient to show that the conspiracy continued at least until February 1988, when John Milton, pursuant to an earlier agreement, sent a check to the Shreveport claimants. It is not dispositive that John, rather than James, did the sending. An act of a co-conspirator may extend the conspiracy "so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Sampol,* 636 F.2d at 676. John's sending the check met this standard. The check, drawn on the settlement fund, reimbursed the Shreveport claimants for their expenses incurred during the height of the illicit scheme and fulfilled a promise that helped lure them to Washington, D.C. Furthermore, the evidence showed that in December 1987, James Milton forged thank-you notes to John Milton at the EEOC using the names of claimants, at least one of whom was a false claim-

ant. In light of this evidence, the sentencing judge, applying a less rigorous standard of proof than the jury, properly determined that the conspiracy continued after November 1, 1987, and that the Guidelines therefore applied.

### III

For the reasons stated, the judgments of conviction of John and James Milton, and the district court's order denying James Milton's motion to vacate his sentence, are affirmed.[10]

---

not be considered subject to cross-examination concerning the statement under [Rule 801(d)(1)(A)]." But *DiCaro* was decided before *Owens* and appears inconsistent with the Supreme Court's reasoning. In any event, whatever may be said about "many or perhaps most cases," in this case Jones was—as the text points out—indeed subject to cross-examination.

10. We have considered and rejected the Miltons' other arguments, including John Milton's claim that he was deprived of the effective assistance of counsel, which the district court denied in a thorough opinion rendered after an evidentiary hearing.